**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

URBAN AFFAIRS COALITION, ET AL.

               Plaintiffs,

      v.

KAREN NICHOLSON A.K.A KAREN SUE
NICHOLSON,  KAREN SUE REYNOLDS,
KAREN S. FELLER, KAREN SUE FELLER,
KAREN S. LONG

               Defendant.

Civil Action No. 2: 25-cv-02261

## VERIFIED SECOND AMENDED COMPLAINT

Plaintiffs Urban Affairs Coalition ("UAC"), Sharmain Matlock-Turner, Arun Prabhakaran, and Kevin Satterthwaite hereby file the above-captioned action against Defendant Karen Nicholson, also known as "Karen Sue Reynolds" ("Karen Sue Reynolds" or "Ms. Nicholson"), and state:

## PARTIES

1.     UAC is a Philadelphia, PA 501(c)(3) with a principal place of business in Philadelphia, Pennsylvania.

2.     Sharmain Matlock-Turner is an adult individual residing in Philadelphia, PA. She is also UAC's CEO.

3.     Arun Prabhakaran is an adult individual residing in Philadelphia, PA. He is also UAC's President.

4.     Kevin Satterthwaite is an adult individual residing in New Jersey. He is also UAC's SVP of Business Services.

5.     Karen Nicholson is an adult individual residing at 2729 Burton Street, Warren, OH 44484.

6.     The name "Karen Nicholson" is an alias used by Pennsylvania fugitive Karen Sue Reynolds.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper in this District because there is complete diversity between the parties and the amount-in-controversy requirement is established. 28 U.S.C. § 1332.

8.     The amount-in-controversy exceeds $75,000, and UAC seeks injunctive relief, costs, expenses, and incidental and consequential damages.

9.     Specific jurisdiction is present because Karen Sue Reynolds committed the intentional torts discussed below, Plaintiffs suffered harm in Pennsylvania as a result of these torts, and Karen Sue Reynolds aimed her tortious conduct at Pennsylvania.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District, and because Karen Sue Reynolds is subject to the Court's personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

**Karen Sue Reynolds**

11.     Karen Sue Reynolds previously resided at 103 Clearview Drive, McMurray, PA 15317. *See* Karen Sue Reynolds' Pennsylvania Driver's license below. In 2019, she fled across the Pennsylvania/Ohio border to Warren, Ohio to escape criminal charges pending against her in the Washington County Court of Common Pleas.



12.    Karen Sue Reynolds has used her background in information technology and various aliases over the years to shield her true identity, criminal history, and pattern of illegal activity.

13.    Each time she is criminally charged and/or convicted, she changes her name.

14.    Karen Sue Reynolds' aliases include Karen S. Long, Karen Sue Nicholson, Karen Nicholson, Karen S. Feller, and Karen Sue Feller. *See* Karen Sue Reynolds' Washington County, Pennsylvania Court of Common Pleas Court Summary, attached as **Ex. A**.[1]

<u>**Karen Sue Reynolds' Pattern of Harassing and Retaliatory Behavior**</u>

**A.  Karen Sue Reynolds' 2008 Criminal Conviction**

15.    In 2008, Karen Sue Reynolds (known at that time as Karen S. Long) was convicted in the Washington County Court of Common pleas of: 1) two counts of false report-falsely incriminating another; 2) two counts of harassment; 3) one count of retaliation against a witness or victim; 4)

---

[1] The name and date of birth on this document matches the name and date of birth on Karen Sue Reynolds' drivers' license.

one count of retaliation for past official action; and 5) one count of unlawfully accessing stored communications. *See* Washington County, Pennsylvania Court of Common Pleas Docket Sheet and Sentencing Order, attached as **Ex. B**.[2]

16.    After this conviction, Karen S. Long adopted the pseudonym Karen Sue Reynolds.

**B. Karen Sue Reynolds' 2017 Illegal Activity**

17.    On February 1, 2016, IT staffing company E-Staff Consulting Group, Inc. ("E-Staff") placed Karen Sue Reynolds with the Pittsburgh Water and Sewer Authority ("PWSA") to work as a data analyst and developer. *See E-Staff Consulting Group, Inc. vs. Karen Sue Reynolds* Complaint at ¶ 7, attached as **Ex. C.**

18.    On March 17, 2016, a PWSA representative contacted E-Staff and informed it that PWSA discovered Karen Sue Reynolds committed numerous egregious errors while working as a data analyst and report developer at PWSA. *Id* at ¶ 9.

19.    As a result, Ms. Reynolds was terminated from her assignment at PWSA the following day. *Id.* at ¶ 10.

20.    Rather than learn from her mistakes, Karen Sue Reynolds attempted to tarnish PWSA's and E-Staff's business reputations through various harassing and retaliatory acts. *Id.* at ¶ 11.

21.    These acts included creating a fake Facebook page and website entitled "estaffpittsburghconsulting.com" with a logo nearly identical to E-Staff's logo where she posted defamatory remarks about PWSA's billing systems and its staff. *Id.* at ¶¶ 12, 28, and 35-37.

22.    They also included disclosing PWSA's confidential information to a vendor, and misappropriating PWSA's trade secrets. *Id* at ¶¶ 9-37.

---

[2] The name and date of birth on this docket sheet matches the name and date of birth on Karen Sue Reynolds' drivers' license.

23.     On April 6, 2016, and April 15, 2015, the Washington County Court of Common Pleas entered preliminary injunctions against Karen Sue Reynolds enjoining her from this activity. *Id.* at ¶¶ 38-39; *see also* April 2015 Preliminary Injunction Order, attached as **Ex. D**.

24.     Undeterred by these injunctions and her prior criminal convictions, Karen Sue Reynolds continued her illegal activity. *Id.* at ¶ 39.

### C.  Karen Sue Reynolds' Active Arrest Warrant

25.     On March 3, 2019, Karen Sue Reynolds was charged with harassment in Washington County, Pennsylvania. *See* Magisterial District Court Docket sheet, attached as **Ex. E**.[3]

26.     On June 6, 2019, Karen Sue Reynolds was convicted of harassment. *Id.*

27.     On July 5, 2019, Karen Sue Reynolds appealed this conviction to the Washington County, Pennsylvania Court of Common Pleas, and on August 21, 2019, Judge Gerald R. Solomon also found her guilty of harassment. *See* Washington County, Pennsylvania Court of Common Pleas Docket sheet, attached as **Ex. EE.**[4]

28.     Two months later, in early-October 2019, Karen Sue Reynolds was charged with two counts of stalking-repeatedly committing acts to cause fear in Washington County, Pennsylvania. *See* Washington County, Pennsylvania docket sheet, attached as **Ex. F**.[5]

29.     But rather than face these charges, Karen Sue Reynolds fled from Washington County, Pennsylvania to Warren, Ohio, and failed to appear at her trial.[6] *Id.*

---

[3] The name and date of birth on this docket sheet matches the name and date of birth on Karen Sue Reynolds' drivers' license.

[4] The name and date of birth on this docket sheet matches the name and date of birth on Karen Sue Reynolds' drivers' license.

[5] The name and date of birth on this docket sheet matches the name and date of birth on Karen Sue Reynolds' drivers' license.

[6] Notably, Paragraph 4 of Ms. Nicholson's Sworn Declaration corroborates this fact by stating "[she] has been a resident of Ohio since October 2019. *See* Dkt. 11-1 page 2 of 3, at ¶4.

30.     In turn, Judge Valerie Costanzo issued a bench warrant for her arrest and ordered the Washington County Sherriff to place Karen Sue Reynolds' name in the National Crime Information Center database.  *See* Karen Sue Reynolds' Bench Warrant, attached as **Ex. G**.

31.     Judge Constanzo's warrant for Karen Sue Reynolds' arrest remains active. *See* **Ex. F.**

32.     Karen Sue Reynolds is currently living off the grid in Ohio under the name "Karen Nicholson" in an effort to hide her criminal past and evade the active warrant for her arrest.

## UAC

33.     UAC is dedicated to uniting government, business, neighborhoods, and individual initiatives to improve the quality of life in the region, build wealth in urban communities, and solve emerging issues.

34.     UAC operates the Economic Development Projects ("EDP") program through which it partners with developers and owners, including hospitals, universities, and museums, to create Economic Opportunity Plans ("EOP").

35.     UAC's EOPs help its clients award contracts to the most qualified businesses, and assist its clients in successfully employing marginalized employees who are often overlooked.

36.     UAC also serves as a fiscal sponsor for numerous partner organizations ("program partners") located within Philadelphia and its surrounding counties.

37.     As a fiscal sponsor, UAC provides its program partners with comprehensive general management, financial, administrative, and human resources support.

## UAC's Trade Secrets

38.     Because of the competitive industry in which UAC operates, UAC closely guards its confidential and proprietary information.

39.     UAC has achieved, and will continue to maintain, its present competitive advantage by preserving the confidential and proprietary nature of its trade secrets and confidential information including its proprietary processes, current and future business plans, strategies for new services and expansion, customer and sales information, pricing and profitability information ("confidentiality and proprietary information").

40.     UAC has taken and continues to take great care to maintain the confidential and trade secret nature of such information by retaining an experienced IT management company, The Hierarchy.

41.     The Hierarchy specializes in professional IT services, and offers a broad range of services, including IT project management, network and systems integration, cloud services, and IT security.

42.     UAC limits access to its confidential information to those with a business need to access it, and requires the employees and contractors it grants access to its confidential information to sign confidentiality agreements.

43.     If UAC's confidential and proprietary information were to become available to a competitor or become public knowledge, UAC's competitive advantage and the substantial investment made by UAC in developing and maintaining its trade secrets and confidential information would be irreparably injured and/or destroyed.

**UAC's Data Migration**

44.     From January 2009 through September 2021, UAC hosted its confidential and proprietary information on its secure servers located at 1207 Chestnut Street, Philadelphia, PA.

45.     The confidential and proprietary information included UAC's EDP contracts and proposals, contracts with program partners and third parties, and its payroll systems. It also

included the names and banking information of UAC's employees, program partners, sponsors, and donors.

46.    In October 2021, UAC decided it wanted to move away from hosting its confidential and proprietary information on secure servers located on site, to hosting this confidential and proprietary information in a NetSuite cloud.

47.    UAC made this decision because hosting its confidential and proprietary information in a NetSuite cloud via Neutrality's secure Philadelphia Data Center provided greater security than hosting this data at it 1207 Chestnut Street location.

48.    To complete this data migration, UAC hired The Hierarchy, an experienced IT company headquartered in Pennsylvania.

### The Hierarchy Retained Ms. Nicholson to Assist with UAC's Data Migration

49.    In early-November 2021, The Hierarchy retained "Karen Nicholson" a.k.a. Karen Sue Reynolds as a Structured Query Language ("SQL") Professional to assist with this project.

50.    The Hierarchy was unaware Karen Nicholson was a Pennsylvania fugitive at that time.[7]

51.    The Hierarchy and Ms. Nicholson agreed she would work for the Hierarchy as an independent contractor on a temporary basis until The Hierarchy completed UAC's data migration.

52.    To ensure UAC's confidential and proprietary information remained protected and Ms. Nicholson did not misappropriate it, The Hierarchy made Ms. Nicholson sign a non-disclosure/confidentiality agreement before granting her access to UAC's confidential and proprietary information. *See* Confidentiality Agreement, attached as **Ex. H**.

---

[7] For ease of reference, Plaintiffs will refer to Karen Sue Reynolds as Ms. Nicholson going forward.

53.    This confidentiality agreement required Ms. Nicholson to keep UAC's confidential and proprietary information confidential, not share it with third parties, and not download or keep this information once her work with The Hierarchy ended.  *Id.* at  ¶ 2.

54.    This confidentiality agreement also contained a choice of law provision stating the agreement would be interpreted under the laws of the Commonwealth of Pennsylvania, and a forum selection clause stating any dispute arising under or in connection with this agreement shall be subject to the exclusive jurisdiction of the state and/or federal courts located in Chester County, Pennsylvania (i.e., EDPA). *Id.* at ¶ 6.

55.    On November 3, 2021, Ms. Nicholson signed and returned The Hierarchy's non-disclosure/confidentiality agreement, via email. She also provided The Hierarchy with her W-9,[8] a copy of her Pennsylvania driver's license, and her banking information. *See* Ms. Nicholson's November 21, 2021 email, Pennsylvania Driver's license, and W-9, attached as **Ex. I**.

56.    Shortly thereafter, The Hierarchy granted Ms. Nicholson access to UAC's confidential and proprietary information, which it hosted in Philadelphia, PA via Neutrality's secure data facility that contained its cloud environment ("secure cloud environment").

57.    Over the next twenty-one months, Ms. Nicholson accessed UAC's confidential and proprietary information via The Hierarchy's Philadelphia-based secure cloud environment hundreds of times.

58.    Over the next twenty-one months, Ms. Nicholson sent thousands of emails from The Hierarchy's email servers located in Philadelphia, Pennsylvania, to UAC's employees located in Philadelphia, Pennsylvania.

---

[8] A W-9 form is completed by an independent contractor for a business and provided to that business for their records. Employers use W-9 forms to complete form 1099, which details the compensation an employer pays an independent contractor.

59.    Over the next twenty-one months, The Hierarchy compensated Ms. Nicholson with funds it transferred from its Pennsylvania bank account.

### Ms. Nicholson Kept UAC's Confidential and Proprietary Information

60.    Ms. Nicholson worked for The Hierarchy on UAC's data migration from November 2021, until The Hierarchy ended her contract in early-August 2023.

61.    As part of Ms. Nicholson's termination, The Hierarchy disabled her access to UAC's confidential and proprietary information, and reminded her of her ongoing obligations under the non-disclosure/confidentiality agreement she signed in November 2021.

62.    Despite this reminder, Ms. Nicholson kept UAC's confidential and proprietary information in direct violation of the terms of her non-disclosure/confidentiality agreement.[9]

63.    Ms. Nicholson accomplished this by downloading a copy of UAC's confidential and proprietary information from The Hierarchy's secure cloud environment located in Philadelphia, PA, to her computer in violation of her non-disclosure/confidentiality agreement, and state and federal law.

64.    Ms. Nicholson refuses to return UAC's confidential and proprietary information despite UAC requesting she return this information.

### Ms. Nicholson Did Not Sue The Hierarchy After Receiving Dismissal Notice

65.    In September 2023, Ms. Nicholson filed a Charge of Discrimination ("Charge") against The Hierarchy with the Equal Employment Opportunity Commission's ("EEOC") Philadelphia Office.

---

[9] UAC did not discover this until Ms. Nicholson published its trade secrets in early-2025.

66.    Ms. Nicholson's Charge alleged The Hierarchy subjected her to retaliation, reverse race, sex, and disability discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA").

67.    On February 14, 2024, the EEOC's Philadelphia Office dismissed Ms. Nicholson's Charge after concluding it could not substantiate her claims.

68.    The EEOC's February 14 Dismissal Notice instructed Ms. Nicholson and her counsel that Ms. Nicholson had ninety days from February 14, 2024, to file a lawsuit against The Hierarchy in federal court.

69.    Ms. Nicholson declined to file a lawsuit against The Hierarchy in federal court.

### Ms. Nicholson Filed an EEOC Charge Against UAC After the EEOC Dismissed Her Charge Against The Hierarchy

70.     Instead, she filed a Charge against UAC with the EEOC's Philadelphia Office despite UAC never being her employer. *See* Nicholson's EEOC Charge, attached as **Ex. J**.

71.    This Charge falsely claimed Nicholson worked for UAC, and that UAC subjected her to retaliation, reverse race discrimination, age discrimination, and gender discrimination in violation of Title VII and Age Discrimination in Employment Act ("ADEA"). *Id.*

72.    On  August 21, 2024,  the EEOC's Philadelphia Office dismissed Ms. Nicholson's Charge against UAC, concluding it could not substantiate her claims. *See* Dismissal Notice, attached as **Ex. K**.

73.    Like the February 14 Dismissal Notice, the EEOC's August 21 Dismissal Notice instructed Ms. Nicholson and her counsel that Ms. Nicholson had ninety days from August 21, 2024, to file a lawsuit against UAC in federal court. *Id.*

74.    Ms. Nicholson did not file a lawsuit against UAC in federal court.

**Ms. Nicholson Admitted She Misappropriated UAC's Trade Secrets**

75.    In January 2025, Ms. Nicholson published a website entitled https://the-hierarchy.net.

76.    Ms. Nicholson is the sole owner and operator of this website.

77.    In March 2025, Ms. Nicholson inadvertently admitted she misappropriated UAC's confidential and proprietary information in two ways.

78.    First, she admitted on her website that she kept over 1,000 emails from UAC management. *See* March 28, 2025 snippet from Ms. Nicholson's website below.[10]

> I have over 1,000 emails from UAC management tracking this and a plethora of other issues since 2/2023. For God's sake, my missing paycheck should be the least of UAC's worries.

79.    Members of UAC's management frequently exchange emails that include UAC's trade secrets and confidential information, including  customer lists, standard operating procedures, protocols, and data associated with EDP, UAC's strategies and techniques to market EDP, data regarding UAC's EDP customers including market data, preferences, contacts, spending history, confidential sales history, strategies to compete in the marketplace, know-how, and negative know-how.  These emails are valuable because they are secret.  If a competitor had access to them, the competitor could replicate UAC's operations and projects, undercutting UAC's positioning in the market.

80.    Second, she published numerous snippets[11] of UAC's confidential and proprietary information on her website. Examples of the confidential and proprietary information Ms.

---

[10] To track and monitor the trade secrets Ms. Nicholson posts on her website, UAC is backing up her site. This snippet is from a March 28, 2025 backup of her https://the-hierarchy.net site.
[11] To protect the confidentiality of UAC confidential and proprietary information, UAC is not posting these snippets in this Complaint.

Nicholson posted snippets of include current EDP business plans, pricing and profitability information, strategies for new services and expansion, and proposals.

81.    UAC's EDP business plans and UAC's proposals include information about the identifies of the businesses and developers with whom UAC does business and the financial arrangements between UAC and those businesses and developers. This information is valuable because it is secret.  If a competitor had this information, the competitor could solicit these relationships away from UAC.

82.    UAC's pricing and profitability information includes the expenses for UAC's projects, the prices it arranges with its partners and vendors, and profit margins. This information is valuable because it is secret. If a competitor had this information, it could replicate UAC's operations and solicit business relationships away from UAC by directly undercutting its pricing.

83.    Documents with UAC's strategies for new services and expansion include highly sensitive and secret competitive business intelligence and sales/marketing strategies including customer lists and market analysis that UAC maintains as confidential. This information is valuable because it is secret. If a competitor had this information, it could pursue those same services and undercut UAC's positioning in the market.

84.    Despite receiving notification that UAC discovered Ms. Nicholson's misappropriation of its confidential and proprietary information, Ms. Nicholson refuses to allow a forensic examination of her computer and electronic data storage devices and cloud accounts to remove UAC's information.

85.    The retention of UAC's confidential and proprietary information in the hands of Ms. Nicholson will cause irreparable injury to UAC. This information, in the hands of a competitor, would cause extensive economic and business injury to UAC.

86.     The harm to UAC caused by Ms. Nicholson's conduct includes the misappropriation, misuse, and disclosure of UAC's confidential and proprietary information and the impairment of and interference with UAC's relations with its program partners and clients.

**Ms. Nicholson Published Blatantly False and Defamatory Statements About Plaintiffs**

87.     Around the same time, Ms. Nicholson began a public smear campaign of Plaintiffs eerily similar to the smear campaign she ran on E-Staff and PWSA back in 2016.

88.     Ms. Nicholson's smear campaign of Plaintiffs was purposely directed at the Commonwealth of Pennsylvania, its citizens, and its government through numerous calculated attempts to cause harm to Plaintiffs in the Commonwealth of Pennsylvania.

89.     At all relevant times, Ms. Nicholson knew the emotional, reputational, employment and privacy-related injuries she was intentionally causing to Plaintiffs would be felt by them in the Commonwealth of Pennsylvania.

90.     Despite this knowledge, Ms. Nicholson disregarded the truth and published numerous false statements about Plaintiffs between March and August 2025 calculated to cause injury to Plaintiffs in the Commonwealth of Pennsylvania.

91.     For example, in March 2025, Ms. Nicholson falsely claimed on her website that "in [her] opinion,[12] UAC may be complicit in facilitating alleged tax and alleged welfare fraud." *See* March 28, 2025 snippets from Ms. Nicholson's website below.[13]

> In my opinion, UAC may be complicit in facilitating alleged tax and alleged welfare fraud. The Philadelphia County Assistance Office (CAO) requires all income be

---

[12] UAC believes Ms. Nicholson conveniently uses the phrase "in my opinion" in hopes of making this statement appear as if it is non-actionable opinion. Despite this phrase, Ms. Nicholson's statement is actionable because it is a mixed opinion based on undisclosed facts.
[13] The snippets below are from a March 28 backup of Ms. Nicholson's site.

**OFFICE SPACE-INSPIRED FRAUD**

*How to make $120K a year to process one person's timesheets*

Jacques Latoison has allegedly been padding timesheets for the past twenty years. The City of Philadelphia, UAC, and Infinite Economic Development Solutions are allegedly complicit, as they are aware of the Hierarchy's alleged fraudulent DEI timesheet padding and continue to support Latoison.

92.    In April 2025, Ms. Nicholson continued to publish factually inaccurate defamatory statements about Plaintiffs.

93.    For example, Ms. Nicholson falsely claimed UAC's Chief Administrative Officer Kevin Satterthwaite allowed a con artist to bill for hours he never worked, and participated in this con artist's theft. *See* April 2025 Snippet from Karen Nicholson's website below.[14]

Kevin Satterthwaite must be held accountable for his failure to protect taxpayer money from a known tax cheat to whom he irresponsibly entrusted unrestricted funds. For ten (10) years, he allowed this con artist to bill for hours that were never worked. When confronted with evidence that Latoison had stolen paychecks, Satterthwaite deflected blame, effectively endorsing the fraudster through his alleged inaction. Furthermore, Satterthwaite allegedly participated in the theft of services by endorsing not paying for mission-critical databases commissioned by UAC EDP during its fake criminal investigation.

---

[14] The snippets below are from a April 24 backup of Ms. Nicholson's site. They remain on her site as of the date of this filing.

94.     Ms. Nicholson also falsely claimed UAC's President Arun Prabhakaran allowed The Hierarchy to embezzle taxpayers' funds. *See* April 2025 Snippet from Karen Nicholson's website below.

> Arun Prabhakaran makes documentaries about Philadelphia crime.
> In my opinion, it *seems* Arun might have **allowed** his IT vendor to allegedly embezzle taxpayer funds. Unless:

95.     Finally, Ms. Nicholson published a meme of UAC's Chief Executive Officer Sharmain Matlock-Turner falsely claiming she could explain how to get paid for ghost hours and steal paychecks. *See* April 2025 Snippet from Karen Nicholson's website below.



96.     In early-April 2025, Ms. Nicholson telephoned Isaac Avilucea, whom she knew to be a writer for Axios Philadelphia, a news publication that covers Philadelphia news.

97.     During her call with Mr. Avilucea, Ms. Nicholson falsely accused UAC of embezzling funds.

98.      In mid-April 2025, Ms. Nicholson telephoned Meir Rinde, whom she knew to be a resident of Philadelphia, Pennsylvania, as well as a writer for Billy Penn, an online publication of WHYY, Philadelphia's public radio station.

99.      During her call with Meir Rinde, Ms. Nicholson falsely accused UAC of embezzling funds.

100.    During her call with Meir Rinde, Ms. Nicholson falsely accused UAC of money laundering.

101.    During her call with Meir Rinde, Ms. Nicholson falsely accused UAC of owing her over $200,000.

102.    During her call with Meir Rinde, Ms. Nicholson falsely accused Mr. Satterthwaite of committing tax fraud.

103.    Ms. Nicholson increased her Pennsylvania-targeted public smear campaign of Plaintiffs in May 2025.

104.    Ms. Nicholson referenced Philadelphia, PA, 94 times on her website in May 2025.

105.    Ms. Nicholson also utilized Facebook and directed online posts at Plaintiffs under the alias "Milton Waddams." *See* Ms. Nicholson's "Milton Waddams" Facebook page, attached as **Ex. L**.

106.    Ms. Nicholson is the sole user and operator of this Facebook page.

107.    On May 3, 2025, Ms. Nicholson falsely insinuated on her Facebook page that UAC was violating Pennsylvania's private inurement laws. *See* May 3, 2025 Screenshot of Ms. Nicholson's Facebook. *See* Screenshot of Ms. Nicholson's May 3, 2025 Facebook post below.



108.    Ms. Nicholson targeted Pennsylvania residents and the Pennsylvania government with this post by tagging the Pennsylvania Auditor General Office, the Governor of Pennsylvania, WURD[15] Radio, and the Pennsylvania Treasurer in her post. *Id.*

109.    On May 6, 2025, Ms. Nicholson falsely claimed UAC placed workers on unpaid leave, denying them their right to file for unemployment or access their PTO or retirement money until they complied with its demand. *See* Screenshot of Ms. Nicholson's May 6, 2025 Facebook post below.

---

[15] WURD radio is the only African American owned and operated talk radio show in the Commonwealth of Pennsylvania. It is located in Philadelphia, PA.



110.    Ms. Nicholson targeted Philadelphia, Pennsylvania residents with this post by requesting they direct message her if this happened to them. *Id.*

111.    Ms. Nicholson also targeted Philadelphia, Pennsylvania residents and Pennsylvania government with this post by tagging the Pennsylvania Auditor General, WURD radio, and the Pennsylvania Governor's office in her post. *Id.*

### Ms. Nicholson Published Blatantly False Statements About UAC In Response To Its Initial Complaint

112.    On May 5, 2025, UAC filed its initial Complaint against Ms. Nicholson.

113.    After Ms. Nicholson reviewed UAC's Complaint, she posted a redacted snippet of Paragraphs 81-84 on her website. *See* May 6, 2025 snippet below.[16]

---

[16] The snippets below are from a May 6 backup of Ms. Nicholson's site. They remain on her site as of the date of this filing.

I am highly offended, too. We know you did not want anyone else to know what is going on inside at UAC.

81. _____ published written statements, viewed by numerous people, indicate U [icon] and its senior leadership team allowed its IT vendor to embezzle taxpayers' funds, were complicit in fraud, received payments for hours no one worked, and stole paychecks.

83. UAC found these statements highly offensive because they were false and unfair, and did not wish for anyone to view them.

84. UAC has suffered damages as a result of _____ publication, including loss of credibility as a nonprofit, embarrassment, and humiliation.

114.    Ms. Nicholson also published additional defamatory statements about UAC.

115.    As an example, on May 14, 2025, Ms. Nicholson falsely claimed UAC hires convicted murderers and child molesters. *See* May 14, 2025 snippet below.[17]



UAC hires convicted murderers and convicted child molesters who work with the public, so no big surprise.

116.    She also falsely claimed UAC is showing nonprofits how to pull off the perfect white-collar crime. *See* May 14, 2025 snippet below.



UAC is teaching nonprofit vendors nationwide a master class in how to pull off the perfect white-collar crime. Arun Prabhakaran and Sharmain Matlock-Turner claim zero responsibility.

117.    The following day Ms. Nicholson baselessly claimed on a page of her website entitled "Double-Billing Scam" that UAC was involved in a double billing scam where UAC Executive Project Manager Carlos Jones simultaneously worked for the City of Philadelphia and UAC. *See* May 15, 2025 snippet below.[18]

---

[17] The snippets below are from a May 14 backup of Ms. Nicholson's site. They remain on her site as of the date of this filing.

[18] The snippets below are from a May 15 backup of Ms. Nicholson's site. They remain on her site as of the date of this filing.

> We now have confirmation that Carlos Jones was a City of Philadelphia FTE from 2014 to 2024. Jones was recorded as working 9-5 at the city and entered hours as a UAC Program "Program Partner" in the EDP (IEDS) timesheet system. He posed as a UAC EDP executive, but UAC paid his private, for-profit company, Infinite Economic Development Solutions, for his hours.

118.    Then, on May 17, 2025, Ms. Nicholson posted a snippet of an edited version of an August 7, 2023 email she sent a UAC employee. Ms. Nicholson posted this email to make it appear as if Carlos Jones gave her permission to download UAC's confidential and proprietary information to her computer, which never occurred. *Compare* Ms. Nicholson's May 15, 2025 edited August 7, 2023 email snippet[19] below *with* the authentic unedited version of this email below.



(Edited version)

---

[19] In the edited version, Ms. Nicholson redacted her name in the "From" section and Vanessa Cheeseborough's name in the "To" section.

21



From: Karen Nicholson <XNicholson@THEHIERARCHY.NET>
Sent: Monday, August 7, 2023 5:16 AM
To: Vanessa Cheeseborough <VCheeseborough@uac.org>
Cc: Carlos Jones <CJones@uac.org>
Subject: Re: Having Issues Logging In This AM

Even stranger is that my Ring Central was just disabled.

I have the #CC database downloaded locally so I can just keep working on the local copy.

Thanks!

Karen Nicholson
THE HIERARCHY

From: Karen Nicholson
Sent: Monday, August 7, 2023 4:59:01 AM
To: Vanessa Cheeseborough
Cc: Carlos Jones
Subject: Having Issues Logging In This AM

I am trying to get your database ready this AM and I am getting some weird message that I am no longer a USER but I still have email.  I will let you know when I can get the reports done.

TY

Karen Nicholson
THE HIERARCHY

(Authentic version)

119.    On May 20, 2025, Ms. Nicholson falsely claimed the Equal Employment Opportunity Commission and DOL ruled that UAC was her employer. *See* May 20, 2025 snippet below.

> A year after the EEOC, in partnership with the DOL, ruled UAC was my employer, 👑 Cease-and-Desist King 👑 firm-hopping Malcolm Ingram is still sending *unsolicited* letters to folks claiming the DOL ruled UAC was not my employer.

120.    Ms. Nicholson also falsely claimed the DOL ruled UAC deliberately misclassified her as a "contractor." *See* May 20, 2025 snippet below.

> The DOL ruled that UAC deliberately misclassified me as a "contractor".

121.    In August 2025, Ms. Nicholson falsely claimed Kevin Satterthwaite and UAC let its staffing vendors bill for hours nobody worked and steal paychecks. *See* August 11, 2025 screenshot below.



122.    None of Ms. Nicholson's statements concerning Plaintiffs and UAC's trade secrets are true.

123.    All of Ms. Nicholson's statements concerning Plaintiffs and UAC's trade secrets are false and defamatory.

124.    All of Ms. Nicholson's statements above concerning Plaintiffs were directed towards, viewed, and read by numerous third parties located in Pennsylvania.

**COUNT I**
**MISSAPROPRIATION OF TRADE SECRETS**
**UAC vs. Ms. Nicholson**
<u>**Pennsylvania Uniform Trade Secrets Act**</u>

125.    Plaintiffs incorporate by reference the preceding paragraphs of their Verified Complaint.

126.    Ms. Nicholson took UAC's trade secrets and confidential and proprietary information while performing work on the UAC data migration project.

127.    She maintains this information in her possession, custody, and control, and refuses to return it.

128.    Such information derives independent economic value by not being generally known, and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure or use.

129.    By the conduct described above, Ms. Nicholson is engaging in the actual or threatened misappropriation in violation of the Pennsylvania Uniform Trade Secrets Act. 12. Pa. C.S. § 5301 *et seq*.

130.    UAC has no adequate remedy at law and would suffer substantial and immediate irreparable harm unless Ms. Nicholson is enjoined as requested below.

131.    Greater injury will be inflicted on UAC by the denial of this relief than will be inflicted on Ms. Nicholson by the granting of this relief.

132.    Ms. Nicholson's actions were intentional, willful, outrageous, malicious, and justify the imposition of exemplary damages.

## COUNT II
## MISSAPROPRIATION OF TRADE SECRETS
### UAC vs. Ms. Nicholson
### <u>Defend Trade Secrets Act</u>

133.    Plaintiffs incorporate by reference the preceding paragraphs of their Verified Second Amended Complaint.

134.    Ms. Nicholson took UAC's trade secrets and confidential and proprietary information while performing work on the UAC data migration project.

135.    She maintains this information in her possession, custody, and control, and refuses to return it.

136.    Such information derives independent economic value by not being generally known, and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure or use.

137.    By the conduct described above, Ms. Nicholson is engaging in the actual or threatened misappropriation in violation of the Defend Trade Secrets Act. 18. U.S.C. § 1831, *et seq.*

138.     UAC has no adequate remedy at law and would suffer substantial and immediate irreparable harm unless Ms. Nicholson is enjoined as requested below.

139.    Greater injury will be inflicted on UAC by the denial of this relief than will be inflicted on Ms. Nicholson by the granting of this relief.

140.    Ms. Nicholson's actions were intentional, willful, outrageous, malicious, and justify the imposition of exemplary damages.

**COUNT III**
**Plaintiffs vs. Ms. Nicholson**
**Defamation *Per Se***

141.    Plaintiffs incorporate by reference the preceding paragraphs of their Verified Second Amended Complaint.

142.    Ms. Nicholson published statements to third parties that impute Plaintiffs committed criminal offenses.

143.    These criminal offenses include embezzlement, tax fraud, money laundering, and theft.

144.    Ms. Nicholson's statements that impute to Plaintiffs the commission of criminal offenses are defamatory *per se*.

145.    Ms. Nicholson's false and defamatory statements were made with actual malice, that is with knowledge of the falsity of the statements or with reckless disregard for the truth.

146.    Ms. Nicholson's false statements of fact were and are undoubtedly understood by any recipients of the statements to be defamatory in nature as they tend to harm the reputation of Plaintiffs, diminish their standing in the community, personally humiliate them, and cause ongoing embarrassment, emotional distress and mental anguish, and professional and financial harm.

147.    Ms. Nicholson had no conditionally privileged occasion on which she was permitted to make such defamatory statements.

148.    As a result of Ms. Nicholson's false and defamatory statements of fact made with actual malice, Plaintiffs have, and will continue to, suffer damages, including reputational harm and loss of good will, in additional to attorneys' fees and costs. For example, a likely consequence is that, in a competitive labor market, UAC may be erroneously viewed as a nonprofit that embezzles or allows its vendors to embezzle funds, and a nonprofit that treats its vendors' subcontractors unfairly and dishonestly. Further, Ms. Matlock-Turner, Mr. Prabhakaran, and Mr. Satterthwaite will be viewed as nonprofit leaders who permit and engage in criminal activity.

**COUNT IV**
**Plaintiffs vs. Ms. Nicholson**
**False Light Invasion of Privacy[20]**

149.    Plaintiffs incorporate by reference the preceding paragraphs of their Verified Second Amended Complaint.

150.    Ms. Nicholson's March and April 2025 posts on her website invaded Plaintiffs' privacy by publicly placing them in a false light.

---

[20] Ms. Nicholson incorrectly claimed in her Motion to Dismiss that Plaintiffs cannot state a false light claim because they cannot show that she published private facts. Dkt. 11, p. 22. Ms. Nicholson is wrong. The case she relies on no longer represents the prevailing standard under Pennsylvania law. *See e.g.*, *Tannous v. Cabrini Univ.*, 697 F. Supp. 3d 350, 369 (E.D. Pa. 2023) (holding "facts selectively disclosed *need not have been private* to support a claim for false light") (emphasis added).

151.    Ms. Nicholson's published written statements, viewed by numerous people, indicate Plaintiffs allowed The Hierarchy to embezzle taxpayers' funds, were complicit in fraud, received payments for hours no one worked, and stole paychecks.

152.    Ms. Nicholson had knowledge of and/or acted in reckless disregard for, the falsity of her publications and the false light in which her publications placed Plaintiffs.

153.    Plaintiffs found these statements highly offensive because they were false and unfair, and did not wish for anyone to view them.

154.    Plaintiffs have suffered damages as a result of Ms. Nicholson's publication, including loss of credibility, embarrassment, and humiliation.

**COUNT V**
**UAC vs. Ms. Nicholson**
**CONVERSION**

155.    Plaintiffs incorporate by reference the preceding paragraphs of their Verified Second Amended Complaint.

156.    At all times, UAC retained all right, title, and interest in the trade secrets, confidential and proprietary information discussed above, which is UAC's property.

157.    Ms. Nicholson has knowingly, dishonestly, and intentionally used UAC's trade secrets, confidential information, and other UAC property without authorization.

158.    Ms. Nicholson has failed to return and cease use of and/or refused UAC's demands to return and cease use of the trade secrets and other UAC confidential information and property she illegally took from it.

159.    As a direct and proximate result of Ms. Nicholson's conduct, UAC has suffered damages.

160.    Ms. Nicholson's actions have been willful and outrageous and undertaken with reckless indifference to UAC's rights.

WHEREFORE, Plaintiffs request the following relief:

a)    Ms. Nicholson, and all other persons or entities acting in concert with her or on her behalf, be temporarily, preliminarily, and permanently enjoined from using, retaining, or otherwise interfering with UAC's possession and control of its property, including any trade secrets, confidential information, or other intellectual property;

b)    Ms. Nicholson, and all other persons or entities acting in concert with her or on her behalf, be temporarily, preliminarily, and permanently enjoined from directly or indirectly using, disclosing, or retaining any trade secrets or confidential and proprietary information of UAC;

c)    Ms. Nicholson be ordered to produce for examination and remediation all her computers, electronic data storage devices, and cloud accounts and to cooperate in the return of UAC's information and remediation of her misappropriation;

d)    A judgment in UAC's favor and against Ms. Nicholson for monetary damages in an amount in excess of $150,000, including all amounts necessary to compensate UAC for Ms. Nicholson's wrongful activities, including reasonable attorneys' fees and costs for her willful misconduct;

e)    a judgment in UAC's favor and against Ms. Nicholson for punitive or exemplary damages for her willful and malicious conduct;

f)    a Permanent Injunction enjoining and restraining Ms. Nicholson and her respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with her, from disparaging Plaintiffs or otherwise posting defamatory statements about them;

g)    that the Court issue an Order at the conclusion of the present matter directing Ms. Nicholson and her respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Ms. Nicholson, to remove,

delete, or otherwise disable such posts, and to undertake such remedial efforts as the Court deems

necessary to restore Plaintiffs' reputation;

h)      attorneys' fees and costs as permitted by law; and

i)      such other relief as the Court deems appropriate.

Dated: August 28, 2025

/s/ Malcolm J. Ingram
Malcolm J. Ingram, Bar No. 323201
mjingram@littler.com
Tanner McCarron, Bar No. 327855
Tmcarron@littler.com
LITTLER MENDELSON, P.C.
Three Parkway, 1601 Cherry Street
Suite 1400
Philadelphia, Pennsylvania 19102.1321
Telephone:      267.402.3000
Facsimile:      267.402.3131

Attorneys for Plaintiffs

## <u>VERIFICATION</u>

I, Arun Prabhakaran, hereby certify as follows:

1.      I am the President of Urban Affairs Coalition ("UAC"). As such, I am authorized to make this Verification on behalf of UAC.

2.      I have read the attached Verified Second Amended Complaint and based on my personal knowledge and my knowledge of information reported to me by subordinates and colleagues, the factual allegations contained in the Verified Second Amended Complaint are true.

3.      I certify under penalty of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct.


Executed on: August 28, 2025                                   _____
                                                                              Arun Prabhakaran